FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAY 3 1 2018
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on May 31, 2018

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

LYFT, INC. and RASIER, LLC,

                    Respondents,

        v.

CITY OF SEATTLE,

                    Appellant,

        And

JEFF KIRK,

                    Defendant.

NO. 94026-6

EN BANC

Filed MAY 3 1 2018

STEPHENS, J.—This case is before the court on direct review of a King County Superior Court order enjoining the release of records the trial court concluded were trade secrets under the Uniform Trade Secrets Act (UTSA), ch. 19.108 RCW. We must decide whether records containing trade secrets are categorically excluded from public disclosure under the Public Records Act (PRA), ch. 42.56 RCW. We hold that they are not. Applying the injunction standard set forth in RCW 42.56.540, such records may be enjoined from disclosure only if

disclosure would clearly not be in the public interest, and would substantially and irreparably damage a person or a vital government interest.

The superior court erred by applying the general injunction standard of Civil Rule (CR) 65 articulated in *Tyler Pipe Industries, Inc. v. Department of Revenue*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982), and by not adequately considering the PRA's more stringent standard. We therefore reverse the decision below and remand for the trial court to apply the proper standard under RCW 42.56.540.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Respondents Lyft Inc. and Rasier LLC[1] operate car-hailing or "transportation networking companies" (TNC) in several locations, including the city of Seattle (City). TNC mobile and Internet-based technology enables consumers to use their smartphones to retain drivers for trips. Drivers connected to the network can access real-time information to respond to consumer requests for rides and carpools. Rasier, in a dominant position with 14,000 drivers in Seattle, competes with Lyft for local market share.

After the City passed a 2014 ordinance that limited the number of TNC drivers active at any given time, respondents Lyft and Rasier (collectively L/R) organized a coalition to overturn the ordinance through a voter referendum. In response to

---

[1] Rasier LLC is a wholly owned subsidiary of Uber Technologies Inc.

mediation among the City, L/R, and taxi and for-hire stakeholders in the ground transportation industry, the referendum proposal was withdrawn. The parties agreed that L/R would submit quarterly standardized reports to the City that include the total number of rides, the percentage of rides completed in each zip code, pick-up and drop-off zip codes, the percentage of rides requested but unfulfilled, collision data, and the number of requested rides for accessible vehicles.[2]

In response to L/R concerns regarding data confidentiality, a mediation provision stated that "'[t]he city will work to achieve the highest possible level of confidentiality for information provided *within the confines of state law*.'" Clerk's Papers (CP) at 2703-04 (emphasis added) (alteration in original) (quoting Ex. 101). The mediation terms, including acknowledgement that their ultimate adoption was subject to city council approval, were subsequently enacted as Seattle Municipal Code (SMC) 6.310.540. The for-hire vehicle regulatory ordinance provides that "[i]f a public records request is made of the City for documents that have been designated by the providing party as confidential or proprietary, the City shall provide third party notice to the providing party prior to disclosure." SMC 6.310.540(D). Likewise, under a confidentiality agreement between the City and Rasier subject to

---

[2] Other mediation outcomes included license and insurance requirements for drivers, mandatory driver background checks, payment of TNC surcharges to offset wheelchair-accessible taxi costs, and lifting the ceiling on the number of drivers.

the requirements of the PRA, the City notifies Rasier upon receipt of a PRA request implicating disclosure of Rasier-designated confidential records.[3]

L/R's zip code reports to the City are extracted through queries from L/R's databases containing driver and passenger records collected using L/R's software programs. In consultation with L/R, the City established a secure, encrypted file transfer protocol (FTP) website for L/R submissions of required quarterly reports. Access to this FTP site is controlled using log-in credentials, both externally and within city government. The City limits access to L/R quarterly reports and derivative public records to persons with a need to know this information within its departments of transportation, and financial and administrative services.

Besides using the L/R zip code reports for regulatory enforcement, the City considers the records to analyze overall TNC impact on transportation systems and infrastructure; enforcement staffing needs and allocation; vehicle-miles traveled and traffic congestion; service levels for all sections of the city; and service disparities such as redlining and discrimination based on impermissible factors, including race and religion. The for-hire vehicle ordinance requires that City staff prepare an annual report for the chair of the Taxi, For-hire, and Limousine Regulations

---

[3] Lyft relies on the nonbinding mediation confidentiality terms that were supplanted by the enactment of SMC 6.310.540. Resp't Lyft's Answering Br. at 27.

Committee of the city council, summarizing TNC-reported public records. SMC 6.310.100(B). Although this city reporting requirement was not included in the mediation terms, neither Lyft nor Rasier objected to this language in the proposed ordinance. The City delayed circulation or release of the draft 2015 report to the committee and city council, after L/R objected and threatened litigation.

L/R insist that their quarterly zip code reports to the City consist of trade secrets protected under the UTSA. *See* Resp't Lyft's Answering Br. at 16; Resp't Rasier LLC's Answering Br. at 1. L/R can consider data compilations and extracts to assess demand for their services, new product launch targets, marketing and pricing strategies, and market competition. While each L/R driver possesses knowledge contained in the records corresponding to individual trips driven, L/R limit employee access to the quarterly zip code reports submitted to the City. L/R do not share their quarterly zip code reports with each other.

In January 2016, appellant Jeff Kirk, a resident of Texas, submitted a PRA request to the City seeking L/R reports for the final two quarters of 2015. Kirk obtains this information from Seattle taxi companies, and researchers examine this information to detect evidence of redlining in the provision of ground transportation to the detriment of persons or communities of color. Specifically, Kirk seeks release of records submitted by L/R to the City as required by SMC 6.310.540, including

the percentage and number of rides picked up in each zip code, and the pick-up and drop-off zip codes of each ride.

In response to his PRA request, the City advised Kirk that the subject reports were labeled by L/R as confidential. The City provided notice of the request to L/R, which then sought an injunction under the PRA to prevent disclosure of the requested reports to Kirk. The King County Superior Court issued a temporary injunction granting partial relief as to zip code records but denying injunctive relief as to data indicating L/R's total number of rides, total number of rides requesting an accessible vehicle, and crime reports. Following an evidentiary hearing in which the court considered live and deposition testimony, the court granted L/R's request for a permanent injunction preventing disclosure of the records, concluding that the zip code reports are trade secrets under the UTSA and, therefore, exempt from disclosure under the PRA. Kirk and the City sought direct review of the injunction by this court, and we granted review.[4]

---

[4] Following the permanent injunction, the court heard a motion for enforcement, addressing zip code records postdating the time frame of the permanent injunction. Although the trial court applied its injunction retroactively to zip code reports prior to December 9, 2016, it declined to opine whether its injunction applied to future quarterly zip code reports. *See* CP at 3877 (Order Granting in Part & Den. in Part Lyft & Rasier's Mots. for Enforcement of J. at 2 (Jun. 14, 2017)) ("With regard to whether the Court's factual finding that the zip code data is a trade secret should extend to post-December 16 data, the Court's interpretation of RAP 7.2 is that that request for relief needs to be made to the appellate court, and the parties can raise with the appellate court the issue of whether

## ANALYSIS

Under the PRA, public records[5] may be withheld only "'in accordance with a statute that exempts or prohibits disclosure in whole or in part of specific information or records.'" *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 251-52 884 P.2d 592 (1994) (*PAWS*) (plurality opinion) (quoting former RCW 42.17.340(1) (1992), *recodified as* RCW 42.56.550(1)). To determine whether the records at issue in this case may be withheld from disclosure, we consider the relevant provisions of both the PRA and the UTSA. While we conclude that L/R's zip code records likely meet the definition of "trade secrets" under the UTSA, L/R are not entitled to an injunction under the applicable PRA standard, RCW 42.56.540, unless they can establish on remand that disclosure is clearly not in the public interest and in fact poses substantial and irreparable harm.

---

the injunction should extend beyond December 16, if the parties believe that it is necessary. But the Court is here to enforce its order entered on December 16 and it related to data preexisting and disclosed to the City prior to December 9 of 2016."); *see also* Report of Proceedings (RP) (June 2, 2017) at 11 ("[I]t was inevitable that more [PRA disclosure] requests were going to come in. . . . 'You're going to keep getting requests.' . . . This is not going to end."). We disagree with the superior court's view of its limited authority under the appellate rules. On remand, the court may consider future records requests, as well as whether backward looking data snapshots in time that are ruled trade secrets remain so in perpetuity, and whether L/R meet their burden for an injunction under RCW 42.56.540.

[5] A "'public record'" "includes any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." RCW 42.56.010(3).

A. The PRA and "Other Statute" Exemptions

The PRA "begins with a mandate of full disclosure of public records; that mandate is then limited only by the precise, specific, and limited exemptions which the Act provides." *PAWS*, 125 Wn.2d at 258. The PRA requires that "[e]ach agency, in accordance with published rules, shall make available for public inspection and copying all public records, unless the record falls within the specific exemptions of subsection (8) of this section, this chapter, or *other statute* which exempts or prohibits disclosure of specific information or records."[6] RCW 42.56.070(1) (emphasis added). "The 'other statutes' exemption incorporates into the Act other statutes which exempt or prohibit disclosure of specific information or records. [Former] RCW 42.17.260(1) [(1992), *recodified as* RCW 42.56.070(1)]. In other

---

[6] "RCW 42.56.070 expressly incorporates into the PRA other statutes such as RCW 43.70.050(2) [health records] that either exempt or prohibit disclosure of specific information or records. The 'other statute' exemption avoids any inconsistency and allows other state statutes and federal regulations to supplement the PRA's exemptions." *Planned Parenthood of Great Nw. v. Bloedow*, 187 Wn. App. 606, 619, 350 P.3d 660 (2015) (citing *Ameriquest Mortg. Co. v. Office of Att'y Gen.*, 170 Wn.2d 418, 440, 241 P.3d 1245 (2010)). *See also Fisher Broad.—Seattle TV LLC v. City of Seattle*, 180 Wn.2d 515, 525-28, 326 P.3d 688 (2014) (holding that RCW 9.73.090(1)(c) of Washington's privacy act is an "other statute" prohibiting disclosure of video recordings made by police that "relate to actual, pending litigation"); *Ameriquest*, 170 Wn.2d at 424, 440 (holding that a federal statute "requiring financial institutions to 'respect the privacy of its customers' and 'protect the security and confidentiality of those customers' nonpublic personal information,'" "together with the [Federal Trade Commission] rule enforcing it" qualifies as an "other statute" (quoting 15 U.S.C. § 6801(a)); *Hangartner v. City of Seattle*, 151 Wn.2d 439, 453, 90 P.3d 26 (2004) (holding the attorney-client privilege as codified at RCW 5.60.060(2)(a) is an "other statute").

words, if such other statutes mesh with the Act, they operate to supplement it. However, in the event of a conflict between the Act and other statutes, the provisions of the [PRA] govern." *PAWS*, 125 Wn.2d at 261-62 (footnote omitted);[7] *see* RCW 42.56.030 ("In the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern."). The PRA is "liberally construed and its exemptions narrowly construed to promote this public policy [to keep Washington residents informed and in control over the instruments they have created] and to assure that the public interest will be fully protected." RCW 42.56.030. "The language of the [PRA] does not authorize us to imply exemptions but only allows specific exemptions to stand." *Brouillet v. Cowles Publ'g Co.*, 114 Wn.2d 788, 800, 791 P.2d 526 (1990).

"[T]o determine if a law applies as an 'other statute' under the PRA, the law must be individually reviewed." WASH. STATE BAR ASS'N, PUBLIC RECORDS ACT DESKBOOK: WASHINGTON'S PUBLIC DISCLOSURE AND OPEN PUBLIC MEETINGS LAWS § 15.2 at 15-3 (2d ed. 2014). When the PRA injunction statute is invoked, this court has described the analysis as follows:

---

[7] Although the dissent (Gonzalez, J.) at 5 correctly points out that the other statute here resides outside of the four corners of the PRA, once the "other statute" exemption is invoked by seeking an injunction from disclosure, the other statute is incorporated into and supplements the PRA. It operates just as an exemption expressly set out in the PRA.

> [W]e start with the proposition that the [PRA] establishes an affirmative duty to disclose public records unless the records fall within specific statutory exemptions or prohibitions. It follows that in an action brought pursuant to the injunction statute ([former] RCW 42.17.330 [(1975),] [*recodified as* RCW 42.56.540]), the initial determination will ordinarily be whether the information involved is in fact within one of the act's exemptions or within some other statute which exempts or prohibits disclosure of specific information or records. If it is not so exempted or prohibited, then the records are to be released subject to the agency's right in certain situations to delete identifying details from the record, in accordance with another specific provision of the act. If it is exempted or prohibited, *then the judicial inquiry commences*.

*Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 36, 769 P.2d 283 (1989) (emphasis added) (footnotes omitted). In sum, when a PRA request is made and a third party asserts an "other statute" exemption, the court first looks at whether the other statute exempts disclosure in the particular context. If the court finds the information is exempt under the "other statute," then "judicial inquiry commences" with the court applying the PRA injunction standard. *Id.*

B. L/R Zip Code Reports Qualify as Trade Secrets under the UTSA, Which Is Incorporated as an "Other Statute" under the PRA

It is undisputed that no provision of the PRA exempts trade secrets from disclosure, so any exemption would need to be pursuant to an "other statute." Trade secrets are addressed in the UTSA, which was enacted to subsume claims of civil liability for misappropriation of trade secrets. *See* RCW 19.108.900(1) ("This chapter displaces conflicting tort, restitutionary, and other law of this state pertaining

to civil liability for misappropriation of a trade secret."). The UTSA contains no

specific exemption of trade secrets from public disclosure laws. Recognizing this,

Lyft cites several narrowly focused statutes outside the UTSA for the proposition

that the protection of trade secrets enjoys broad policy support.[8] However, none of

these statutes provides a relevant disclosure exemption in this case.

In *PAWS*, we concluded the UTSA may qualify as a PRA "other statute" in

some contexts. 125 Wn.2d at 262 ("Two state statutes [including the UTSA] qualify

as 'other statutes' in the present context, although neither justifies withholding the

grant proposal in its entirety."). *PAWS* requires that courts determine whether the

UTSA is an "other statute" based on individual review—in this case, in regard to the

L/R zip code reports. Under the UTSA, a "trade secret" consists of "information,

including a formula, pattern, compilation, program, device, method, technique, or

---

[8] *See* Lyft's Answer to Br. of Amicus Curiae Wash. State Ass'n of Mun. Att'ys at 2-3 (citing RCW 17.24.061 (regarding insect and plant diseases); RCW 48.130.070 (regarding interstate insurance regulation compact); RCW 49.17.200 (regarding Industrial Safety and Health Act); RCW 39.10.470 (regarding alternative public works contracting procedures); RCW 31.45.030, .077, .090 (regarding small loan endorsement); RCW 80.04.095 (regarding public utilities); *PAWS*, 125 Wn.2d at 262-63 (citing LAWS OF 1994, ch. 42, § 1, regarding product liability and hazardous substance claims)). Notably, these statutes identify isolated instances of protected records and lack the broad sweep of the PRA policy in favor of disclosure. *See* RCW 42.56.030 ("This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected. In the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern.").

process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." RCW 19.108.010(4). "The parties seeking to prevent disclosure . . . bear the burden of proof." *Confederated Tribes of Chehalis Reservation v. Johnson*, 135 Wn.2d 734, 744, 958 P.2d 260 (1998). We review interpretation of the UTSA de novo as a question of law, while we review whether specific information satisfies the statute's definition of a "trade secret" in any given case as a question of fact. *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 436-37, 971 P.2d 936 (1999). Although it is a close question, the trial court sustainably found that the L/R zip code records meet the standards for trade secret protection under the UTSA.

The City contends that the trial court neglected to make concrete findings on the required UTSA elements. RCW 19.108.010(4). First, the City argues that the court failed to specifically find, based on the facts, that the L/R zip code reports constitute a compilation under the UTSA. Opening Br. of Appellant City at 38-39. Because the UTSA provides no definition for the term "compilation," we look to its usual and ordinary dictionary definition. *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d

655 (2002). *Webster's* defines "compilation" as "something that is a product of the putting together of two or more items: as . . . an accumulation of many things, elements, or influences." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 464 (1981).

Lyft argues that its zip code reports constitute an "'accumulation' of all zip code data for each and every Lyft ride [documented] on the quarterly reports, . . . contain[ing] the entire universe of zip code data for Lyft for any given quarter." Resp't Lyft's Answering Br. at 17-18. L/R zip code reports are distinguishable from the discrete reports for which the superior court denied injunctive relief. CP at 266 (Order Granting in Part & Den. in Part Pls.' Mot. for Prelim. Inj. at 3 (Mar. 21, 2016)). The trial court inferred that zip code report queries that extract data equate to an ability to compile information. CP at 2705. The facts demonstrate these L/R zip code reports consist of extracts from larger, more granular L/R database compilations. We conclude that substantial evidence supports the superior court's factual determination that the zip code reports constitute a compilation of information consistent with the UTSA.

Next, the City argues that the superior court failed to make concrete findings regarding the effort and expense L/R undertook in extracting quarterly zip code records using the City's reporting template, that neither Lyft nor Rasier met its

burden to demonstrate the zip code reports have independent economic value because little or no effort or expense was incurred in producing these reports, and that the real value resides in other L/R data not reported to the City. Opening Br. of Appellant City at 40-42. It notes that "neither [Lyft nor Rasier] attempted to 'quantify in any meaningful way the competitive advantage' the other 'would enjoy' if the information was released." *Id.* at 42. Information possesses independent economic value under the UTSA when effort and expense were incurred to develop the information. *McCallum v. Allstate Prop. & Cas. Ins. Co.,* 149 Wn. App. 412, 424, 204 P.3d 944 (2009); *Nowogroski Ins.,* 137 Wn.2d at 438. The information must not be readily ascertainable from another source. *Spokane Research & Def. Fund v. City of Spokane,* 96 Wn. App. 568, 577-78, 983 P.2d 676 (1999).

The trial court found value in the zip code reports as a spatial indicator of L/R revenue generation and as a strategic indicator for marketing new products. CP at 2705. The court also found that both L/R are interested in obtaining the other's zip code reports, though this was hotly debatable. *Id.* The superior court found the zip code reports are not readily ascertainable by competitors by proper means. CP at 2717. While it is a close call, the record sufficiently demonstrates the independent economic value of the data reflected by the zip code reports, including as an indicator for potential routes for launching new ride pool and sharing products, and markets

for subscription services. Substantial evidence supports the superior court's finding of independent economic value in the zip code reports.

Finally, the City argues that every L/R driver accesses company data, even when also driving for the competitor TNC, and thus the zip code data is not a trade secret that is the "subject of efforts that are reasonable under the circumstances to maintain its secrecy." RCW 19.108.010(4)(b); *see also* Opening Br. of Appellant City at 47. Respondents reply that although the driver may have access to the beginning and ending zip codes for each trip driven, the driver lacks access to other records in the quarterly zip code report. Resp't Rasier LLC's Answering Br. at 28. The superior court found that the respondents L/R do not share the zip code reports between each other because of the perceived competitive disadvantages of doing so. CP at 2705-06. L/R restrict access to the zip code reports internally within their companies, with corresponding policies and procedures. CP at 2706. The limited data drivers have is not the same data L/R protect. Substantial evidence supports the superior court's finding that L/R make reasonable efforts under the circumstances to maintain the secrecy of the zip code reports.

In sum, while the evidence is mixed and the question is not beyond debate, the superior court sustainably concluded that L/R's zip code reports are "trade secrets" within the meaning of the UTSA. For this reason, the UTSA is properly

regarded as an applicable "other statute" in this context. *See PAWS*, 25 Wn.2d at 261-62. Concluding that L/R records contain trade secrets does not end the inquiry, however. As noted, there is no categorical exemption for trade secrets under the PRA, and we must therefore determine whether L/R are entitled to an injunction to prevent the City from disclosing the records in response to a public records request.

   C. Whether L/R Are Entitled to an Injunction Preventing the City from Disclosing Zip Code Records Turns on Application of the PRA Injunction Standard in RCW 42.56.540

The central question concerning L/R's motions for injunctive relief is which injunction standard applies. L/R argue that trade secrets must be protected from disclosure under the UTSA without regard to the PRA injunction standard. Injunctive relief for trade secrets under the UTSA follows the general standard of CR 65. Specifically, "'one who seeks relief by temporary or permanent injunction must show (1) that he has a clear legal or equitable right, (2) that he has a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of are either resulting in or will result in actual and substantial injury to him'". *Tyler Pipe Indus.*, 96 Wn.2d at 792 (quoting *Port of Seattle v. Int'l Longshoremen's & Warehousemen's Union*, 52 Wn.2d 317, 319, 324 P.2d 1099 (1958)).

The City counters that the PRA injunction standard applies rather than the UTSA standard because L/R seek to enjoin the City from complying with its duty to

disclose records under the PRA. The City criticizes the superior court for "failing to apply the proper injunction standard under the PRA, opting instead to apply the lesser standard governing injunctions under CR 65." Consol. Reply Br. of Appellant City at 5 ("The trial court failed to make the requisite findings to support injunctive relief under the PRA, and this error was not harmless. Reversal is required on this ground alone.").

For the reasons explained below, we agree with the City that the PRA injunction standard must apply. Under this standard, L/R are entitled to a permanent injunction only if the public records disclosure would clearly not be in the public interest, and would substantially and irreparably damage any person or would substantially and irreparably damage vital government functions. RCW 42.56.540.

1. Status as "Trade Secrets" Does not categorically exempt Records from Disclosure; The PRA Injunction Statute Governs Whether Exempt Records can Be Withheld from Disclosure.

The superior court held that because L/R records constitute trade secrets under the UTSA, they are categorically exempt from disclosure under the PRA. *See* CP at 2718 ("Because Lyft and Rasier proved that the Zip Code Data are trade secrets, the data is exempt from disclosure under RCW 42.56.070(1).)"; *see also* CP at 2715 ("If the City's position were correct, then there *could* be instances in which one could

use the PRA to acquire knowledge of a trade secret.").[9] In so holding, the court collapsed two separate inquiries: (1) whether records are subject to an exemption under the PRA and (2) whether their disclosure may be enjoined. This was error.

As noted above, our case law interpreting the PRA injunction statute makes clear that finding an exemption applies under the PRA does not ipso facto support issuing an injunction. *See Spokane Police Guild*, 112 Wn.2d at 36 (noting that once records are exempt, the "judicial inquiry" must commence); *accord Soter v. Cowles Publ'g Co.*, 162 Wn.2d 716, 757, 174 P.3d 60 (2007) (plurality opinion) ("[T]o impose the injunction contemplated by RCW 42.56.540, the trial court must find that a specific exemption applies *and* that disclosure would not be in the public interest and would substantially and irreparably damage a person or a vital government interest."); *Morgan v. City of Federal Way*, 166 Wn.2d 747, 756-57, 213 P.3d 596 (2009) (same); *Belo Mgmt. Servs., Inc. v. Click! Network*, 184 Wn. App. 649, 661, 343 P.3d 370 (2014) (even if the party seeking an injunction proves that it possesses

---

[9] The dissent (Gonzalez, J.) at 2 offers *Boeing Co. v. Sierracin Corp.* for the proposition that a trade secret might not lose its confidential status when submitted to the Federal Aviation Administration. 108 Wn.2d 38, 52, 738 P.2d 665 (1987) (citing *Air Line Pilots Ass'n, Int'l v. Fed. Aviation Admin.*, 552 F. Supp. 811, 814 (D.D.C. 1982)). *Sierracin* is distinguishable because it involved misappropriation of trade secrets by a private contractor with a duty of confidentiality. In contrast, the City owed no similar duty, and therefore misappropriation is absent. Because the UTSA injunction standard requires a showing of actual or threatened misappropriation, it remains inapplicable in this case. RCW 19.108.020. Further, *Sierracin* did not involve application of the PRA.

a trade secret under an "other statute," it still must "prove the requirements for an injunction under RCW 42.56.540"); *see also* PUBLIC RECORDS ACT DESKBOOK § 17.3, at 17-11 ("the party seeking to prevent disclosure bears the burden of proving both that a specific exemption applies, and that the additional RCW 42.56.540 injunction elements are satisfied" (citation omitted)). As this court explained in *Soter*, "[i]t may be that in most cases where a specific exemption applies, disclosure would also irreparably harm a person or a vital government interest. But if we assume that the additional findings contemplated by RCW 42.56.540 are unnecessary, then a significant portion of the statute is rendered superfluous." 162 Wn.2d at 756-57.[10]

In addition the UTSA authorizes an injunction as a remedy only when there has been an actual or threatened misappropriation of trade secrets. RCW 19.108.020. "'Misappropriation' means: . . . [d]isclosure or use of a trade secret of another without express or implied consent by a person who: . . . (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C)

---

[10] This court in *Soter* rejected the view of the Court of Appeals that "if a specific exemption applies, the trial court can ignore the remaining requirements of RCW 42.56.540." 162 Wn.2d at 756. The lower court had reasoned that by creating an exemption, the legislature presumably "'determined that harm to the agency would outweigh the benefit to the requester,'" making additional findings unnecessary. *Id.* (quoting *Soter v. Cowles Publ'g Co.*, 131 Wn. App. 882, 902, 130 P.3d 840 (2006)).

derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." RCW 19.108.010(2)(b)(ii).[11] Here, the City owed no legal duty to maintain the confidentiality of public records and had no authority to make promises of confidentiality inconsistent with the PRA. *See* WAC 44-14-06002(1) ("Any agency contract regarding the disclosure of records should recite that the [PRA] controls."); *see also Spokane Police Guild*, 112 Wn.2d at 40) ("'[P]romises cannot override the requirements of the disclosure law.'" (quoting *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 137, 580 P.2d 246 (1978)); PUBLIC RECORDS ACT DESKBOOK 13.5, at 13-17 ("any such contractual promise will not prevent disclosure in response to a PRA request"). Because the City's PRA duty of transparency does not yield to confidentiality promises, the City had no "duty" to

---

[11] Curiously, the dissent never applies this statutory test for misappropriation, even though a finding of actual or threatened misappropriation is required for an injunction under the UTSA. Doubly curiously, the dissent goes on to apply the UTSA injunction standard anyway, without a finding of actual or threatened misappropriation. *See* (Gonzalez, J.) at 8. Because the City owes no duty of confidentiality, of course no misappropriation is threatened. Still avoiding the statutory test for misappropriation, the dissent also applies the test for determining whether a record is a trade secret. *Id.* In so doing, the dissent makes the same mistakes as the trial court by assuming a categorical exemption from disclosure for trade secrets and collapsing two independent inquiries: (1) whether records are subject to an exemption under the PRA, and (2) whether their disclosure may be enjoined.

support an argument of misappropriation.[12]  And, absent any misappropriation, the

UTSA does not authorize an injunction.

_____

[12] Justice Gordon McCloud's dissent at 1-2 suggests that the trade secrets at issue here constitute property that is protected from takings under the Fifth Amendment to the United States Constitution and article I, section 16 of the Washington Constitution, even though none of the parties neither briefed nor argued this issue.  The dissent cites for authority *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984), but it provides no support.  Rather than categorically deeming trade secrets as property protected from takings, the Court cautioned that "[t]he inquiry into whether a taking has occurred is essentially an 'ad hoc, factual' inquiry." *Id.* at 1005 (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979)).  The Court elaborated that the "Trade Secrets Act is not a guarantee of confidentiality to submitters of data, and, absent an express promise, Monsanto had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of [federal Environmental Protection Agency]." *Id.* at 1008; *see Asarco Inc. v. Dep't of Ecology*, 145 Wn.2d 750, 761, 43 P.3d 471 (2002) ("ad hoc, factually specific analysis" includes "the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations").  In this case, the City made no promise of confidentiality, but merely stated in mediation terms that "[t]he city will work to achieve the highest possible level of confidentiality for information provided within the confines of state law."  CP at 156 (Pl. Ex. 101 (Decl. of Kiersten Grove), App. A at 3); *see* CP at 155 ("Property rights remain subject to any and all City regulations.  The City assumes no liability for devaluation of the property interest due to regulatory action or market forces.").  Because state law prohibits the City from agreeing to limit public records disclosure, any reliance by L/R is not reasonable nor enforceable.  *See Ruckelshaus*, 467 U.S. at 1005 ("A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" (quoting *Webb's Fabulous Pharm., Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980))).

Moreover, any speculation that the parties demonstrated an interest in a takings claim is unsupported by their testimony at trial.  L/R's valuation of the public records at issue scarcely established a required valuation showing for trade secrets, and certainly falls short of establishing a putative valuation loss under a takings analysis.  *See* RP (Oct. 10, 2016) at 106 (Rasier considers competitor zip code data as "having a ton of value"); Opening Br. of Appellant City of Seattle at 41 ("[H]e testified that Lyft spent 'millions and millions' building its App, 'millions and millions' maintaining its App, and 'millions and millions, untold millions' acquiring drivers and passengers in Seattle" (quoting RP (Oct. 11, 2016) at 80)), 41 n.15 ("When asked how much Lyft would pay for Uber's 'zip code

The superior court erred, relying solely on *PAWS*, by accepting L/R's argument that the court there carved out trade secrets from application of the PRA. CP at 2713 ("the confidentiality of trade secret information is be protected and unnecessary disclosure prevented"); *see also PAWS*, 125 Wn.2d at 262 ("The Public Records Act is simply an improper means to acquire knowledge of a trade secret."). This reads too much into *PAWS*. The court in *PAWS* did not consider whether an injunction under any standard would be appropriate to protect trade secrets, as no injunction was at issue. *PAWS* is also distinguishable because the university is held to strict confidentiality standards that govern the research funding proposals at issue. *See* 125 Wn.2d at 249 ("The peer review process is highly confidential, and breach of the standards applicable to that review and its participants may result in scientific misconduct charges being filed. Moreover, the scientific community as a whole, and

---

data,' Mr. Kelsay provided no number, testifying only that '[i]t would be worth every penny.'" (quoting RP (Oct. 11, 2016) at 97)). Further, no party has argued that using zip code data to detect and enforce redlining and discrimination in the provision of public ground-transportation accommodations is not a legitimate public purpose. While noting that this issue is not properly before the court, the dissent offers no reason why authentic property deprivations may not be considered by a court in the substantial and irreparable harm balancing under the PRA injunction standard. RCW 42.56.540. Because this issue is not properly before us, and lacking the requisite factual record considered against the applicable legal standards, we need not dwell further on the merits of the dissent's suggestion. RAP 13.7(b); *Schreiner Farms, Inc., v. Smitch*, 87 Wn. App. 27, 32-33, 940 P.2d 274 (1997) (citing *Guimont v. Clarke*, 121 Wn.2d 586, 604, 854 P.2d 1 (1993), *cert. denied*, 510 U.S. 1176 (1994))).

other universities, private and public, do not disclose information contained in unfunded grant proposals." (citation omitted)). That duty of confidentiality is lacking here. Finally, in rejecting an argument that the PRA injunction statute itself operated as an exemption, the court fully recognized the two-step inquiry required when PRA exemptions are at issue, noting that the PRA injunction statute "governs access to a remedy" when records are found to fall within an exemption. *Id.* at 258; *see also Soter*, 162 Wn.2d at 756-57 (rejecting view that PRA exemption alone allows the withholding of records without regard to injunction standard in RCW 42.56.540); PUBLIC RECORDS ACT DESKBOOK § 13.5, at 13-18 ("The only way to [prevent disclosure] is to seek injunctive relief pursuant to RCW 42.56.540, which 'governs access to the injunctive remedy' to prevent disclosure of a public record.") (quoting *PAWS*, 125 Wn.2d at 257-58).[13] The two-step inquiry applies regardless of

---

[13] The *Public Records Act Deskbook* misquotes *PAWS* here; the actual language was "governs access to a remedy." *PAWS*, 125 Wn.2d at 258. The dissent criticizes the *Deskbook* for misquoting *PAWS* and concludes that our reference in that case to "*a* remedy" rather than "*the* remedy" suggests courts need not apply RCW 42.56.540 to enjoin the disclosure of trade secrets. *See* (Gonzalez, J.) at 6-7 (citing PUBLIC RECORDS ACT DESKBOOK § 13.5 at 13-1). Notwithstanding the *Deskbook*'s misquote, this is not a reasonable reading of *PAWS*, which clearly identified the PRA injunction standard as the relevant remedy provision, in distinction from any relevant *exemption* provisions of the PRA. 125 Wn.2d at 257-58. Any doubt about this was subsequently resolved in *Soter*, when we explained that the existence of a specific exemption does not mean "the trial court can ignore the remaining requirements of RCW 42.56.540." 162 Wn.2d at 756. Instead, we clarified that "the trial court must find that a specific exemption applies *and* that disclosure would not be in the public interest and would substantially and irreparably damage a person or a vital government interest." *Id.* at 757.

whether the exemption at issue is expressly set out in the PRA or incorporated via an "other statute." *PAWS*, 125 Wn.2d at 258; *see also Spokane Police Guild*, 112 Wn.2d at 36, 39 (noting that if a record is exempt under the PRA or an "other statute," then the court can consider an injunctive remedy under the PRA).

Consistent with *PAWS* and *Soter*, we recognize that the PRA injunction statute provides the governing standard for considering whether trade secrets may be withheld from disclosure. Given the broad range of "other statutes" courts consider in connection with the PRA, consistent application of the PRA requires the consistent procedural operation of the PRA injunction standard regardless of the exemption or "other statute" asserted. After all, PRA exemptions are recognized through operation of the PRA, not outside it. The UTSA may not be invoked to carve out trade secrets from application of PRA procedural provisions. As is clear from the fact that L/R initially sought injunctive relief under RCW 42.56.540, this is a PRA case and not a trade secrets case.[14]

Our holding today reinforces our prior precedent adhering to a two-step inquiry under the PRA when an injunction is sought. First, the court must determine whether the records are exempt under the PRA or an "other statute" that provides an

---

[14] We reject the City's suggestion that there is a conflict between the PRA and the UTSA. As interpreted here, the statutes are compatible.

exemption in the individual case. Second, it must determine whether the PRA injunction standard is met.

Having set forth the required analysis, we turn now to its application in this case. The court below incorrectly applied the lesser injunction standard of CR 65, on the misapprehension that recognition of L/R records as trade secrets renders them categorically exempt from public disclosure. At the same time, the court indicated that "it does not matter in this case [which injunction standard applies] because Lyft and Rasier have established an entitlement to an injunction under both the UTSA and RCW 42.56.540." CP at 2716. We do not find this statement to be dispositive. Notwithstanding the superior court's nod to the PRA injunction standard, in application the court's findings failed to address that standard. As explained below, there are factual disputes to be resolved, and we must remand the case to the trial court to determine whether L/R have demonstrated an entitlement to injunctive relief under RCW 42.56.540. To provide guidance, we outline what RCW 42.56.540 requires and why the existing findings and conclusions fail to address the statutory standard.

2. Under RCW 42.56.540, L/R Are Not Entitled to an Injunction Unless the Trial Court Finds That Disclosure Would Clearly Not Be in the Public Interest and Would Cause Substantial and Irreparable Harm

"If one of the PRA's exemptions applies, a court can enjoin the release of a public record only if disclosure 'would clearly not be in the public interest and would substantially and irreparably damage any person, or . . . vital governmental functions.'" *Morgan*, 166 Wn.2d at 756-57 (alteration in original) (quoting RCW 42.56.540 and citing *Soter*, 162 Wn.2d at 757). The injunction standard requires a showing on both elements. *See Soter*, 162 Wn.2d at 757. "In a proceeding brought under this injunction statute, the party seeking to prevent disclosure has the burden of proof." *Spokane Police Guild*, 112 Wn.2d at 35. A decision granting or denying an injunction under the PRA is reviewed de novo. *Serv. Emps. Int'l Union Local 925 v. Freedom Found.*, 197 Wn. App. 203, 212, 389 P.3d 641 (2016); RCW 42.56.550(3). However, findings of fact based on the testimonial record are reviewed for substantial evidence. *Zink v. City of Mesa*, 140 Wn. App. 328, 336-37, 166 P.3d 738 (2007).

The superior court's bare-bones conclusion that "Lyft and Rasier are entitled to an injunction under RCW 42.56.540," CP at 2720, did not follow adequate consideration of the public interest and irreparable harm elements of the statute. As to the public interest, the court below merely referenced statutes cited by L/R that

protect specific information in specific contexts, and cited the holding in *PAWS*. CP at 2713-15. But a finding that the protection of certain trade secrets furthers a public interest does not amount to a finding that public disclosure of the specific L/R zip code records collected by the City is "clearly not in the public interest." Nor would such a finding logically follow, given the public interest in analyzing zip code records, including the interest in discerning discriminatory conduct.

L/R emphasize the general policy underlying the UTSA to protect trade secrets and prevent misappropriation. As noted above, however, the UTSA does not itself support an injunction here, and the statutes L/R cite express a policy of protecting specific information in specific contexts, not a categorical legislative declaration that trade secrets should not be subject to public disclosure laws.[15] The UTSA addresses misappropriation, threatened misappropriation, and related tort claims and contemplates unfair competition among private actors; it does not address

---

[15] For this same reason, the dissent's policy argument is unavailing. Dissent (Gonzalez, J.) at 1, 9; *see supra* note 8. Although the dissent expresses a need to balance disclosure with trade secrets protection, dissent (González, J.) at 10, it provides no rationale why the PRA injunction standard is inadequate at addressing the required balancing declared by the legislature. *See* RCW 42.56.030 ("The people insist on remaining informed so that they may maintain control over the instruments that they have created. This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected. In the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern."). We therefore remand for trial court performance of the required balancing test in RCW 42.56.540.

public disclosure laws. Once records that comprise trade secrets are deemed important enough to warrant collection by agencies for public purposes, additional considerations of public interest pertain. Stated differently, the UTSA policy of restraining company X from wrongfully misappropriating company Y's trade secrets does not necessarily translate into a policy of preventing public inspection of records important to government purposes. The more stringent injunction standards of the PRA reflect the importance of public oversight over public records, in contrast to the lesser UTSA standard that applies in disputes involving misappropriation of trade secrets by private parties.

The records at issue in this case arguably involve matters of public interest, and there is no trial court finding to the contrary. The City collects zip code data from taxi companies, and it uses the data from those companies and the TNCs to evaluate traffic and infrastructure concerns, determine future needs, and assess claims of discriminatory redlining. Appellant Kirk notes that TNC redlining in Seattle has been detected through academic research studies. Kirk's Statement of Grounds for Direct Review at 2.[16] While the superior court acknowledged the public interest in data that might evidence redlining, it erroneously concluded that the

---

[16] *See* Mark Scott, *Study Finds Some Uber and Lyft Drivers Racially Discriminate*, N.Y. TIMES, Oct. 31, 2016, https://www.nytimes.com/2016/11/01/ technology/uber-lyft-racial-discrimination.html?smid=tw-share (last visited May 23, 2018).

public could trust the City to adequately police redlining using the zip code reports, obviating the need for public disclosure. *See* CP at 2719 ("But the City is able to analyze the data to ensure no red-lining is occurring and city witnesses testified at trial that they had no evidence of any such practice occurring at either [Lyft or Rasier].").[17] This conclusion ignores the core policy underlying the PRA, under which "[t]he people of this state do not yield their sovereignty to the agencies that serve them." RCW 42.56.030. Further consideration of the public interest element is required, and we remand to the trial court to evaluate all of the facts in light of the PRA's requirement that disclosure "may be enjoined" when "clearly not . . . in the public interest." RCW 42.56.540.

As to the harm element, the City insists that L/R have not established "that disclosure would cause actual and substantial injury [under the CR 65 test], let alone 'irreparable and substantial damage' under the PRA." Opening Br. of Appellant City at 33. It dismisses the proffered evidence as too speculative and conclusory to provide a basis for measuring whether substantial and irreparable damage could

---

[17] The trial court also suggested that city staff could advise the city council without disclosing the zip code reports, and that Kirk and other researchers would be satisfied with manipulated heat maps or disintegrated data depictions, without regard to data integrity for research purposes. It is not enough for the court to proclaim that other available records might serve the public's or a requester's needs. The question under the PRA is whether city compliance with the specific PRA request is clearly not in the public interest.

occur through PRA disclosure. *Id.* at 31. Unlike in the customer database cases L/R rely on, the City argues it is not collecting and disclosing customer identifying data in the quarterly reports that would allow L/R to poach customers from each other. *See* Resp't Rasier LLC's Answering Br. at 26; *see also Nowogroski Ins.*, 137 Wn.2d at 440-41 ("a manufacturer's customer list had potential economic value and was protectable under the California Uniform Trade Secrets Act[, CAL. CIV. CODE §§ 3426-3426.11,] because it allowed competitors like the defendant to direct their sales efforts at specific potential customers" (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993))).

The superior court acknowledged that "the PRA would require Lyft and Rasier to meet a higher burden of proof: that disclosure 'would clearly *not* be in the public interest' and disclosure would cause 'substantial and *irreparable* damage.'" CP at 2714 (quoting RCW 42.56.540). However, based apparently on its legal error that trade secrets are categorically exempt from disclosure, the court reached the circular conclusion that "public disclosure of trade secrets under the Public Records Act constitutes irreparable harm because such disclosure 'destroys the information's status as a trade secret.'" CP at 2718. The trial court's additional findings relating to harm failed to consider the heightened PRA standard. In its injunction analysis under *Tyler Pipe Industries*, the court concluded that disclosure will cause actual and

substantial injury because L/R "will be able to gain an unfair competitive advantage against each other with the disclosure of this data." *Id.* And, albeit without attribution to the record, the court accepted the assertion that "disclosure of Lyft's trade secret Zip Code Data presents the company with an existential threat." CP at 2720.[18] If true, then disclosure might result in substantial and irreparable damage, but the trial court never considered the facts in light of this standard.

We remand for the court to consider its findings reached under the CR 65 standard in light of the "substantial and irreparable" harm standard of the PRA. L/R bear the burden of showing sufficient harm, in addition to meeting the "clearly not in the public interest" element, in order to justify injunctive relief under RCW 42.56.540. *See Spokane Police Guild* 112 Wn.2d at 35 (noting the party seeking PRA injunction bears the burden of proof). Meaningful assessment against PRA

---

[18] The superior court found that "Lyft's market share is a fraction of Uber's market share. Because Uber has such a dominant position in the TNC market, it could use Lyft's data to squeeze Lyft out of the Seattle market, giving Uber a monopoly in the TNC market. Such an occurrence is not in the public's interest." CP at 2720. Even if the court's conclusions might be sufficient to prevent disclosure of Lyft's zip code reports, the analysis regarding disclosure of Rasier's zip code records is missing for both elements: whether disclosure (1) "would clearly not be in the public interest" and (2) "would substantially and irreparably damage any person, or . . . vital governmental functions." RCW 42.56.540. In this regard, because the dissent (Gonzalez, J.) at 2 n.3 lumps together Lyft, Uber, and Rasier under the moniker "Lyft," it shields Rasier from any scrutiny under the injunction test and thereby neglects to fully adjudicate the issues before us. The dissent thus repeats a mistake of the trial court by failing to apply the required injunction test independently to each of the respondents. *See* CP at 2720.

standards is required in order to grant an injunction preventing disclosure under the PRA. This assessment involves the resolution of disputed facts. We recognize that it might be possible to conclude from the lack of adequate findings under the PRA that the heightened standard for injunctive relief is not met. However, for this court to reach such a conclusion seems heavy-handed considering the proceedings below, which were largely shaped by the trial court's legal error in applying the *Tyler Pipe Industries* injunction standard. We believe a remand is an appropriate and cautious remedy to ensure that all facts have been fully considered and assessed under the proper injunction standard.

## CONCLUSION

The PRA injunction standard applies to public records that constitute trade secrets under the UTSA, just as it applies to other records encompassed by any PRA exemption. In line with our prior cases interpreting the PRA injunction standard, we recognize the two-step analysis courts must engage in when considering injunctive relief: (1) whether the public record is subject to an exemption under any PRA provision or an applicable "other statute," and (2) whether the party seeking to enjoin disclosure has shown that disclosure is clearly not in the public interest, and would result in substantial and irreparable harm to any person or vital government interest.

We reverse the superior court's order granting injunctive relief and reject application of the *Tyler Pipe Industries* injunction standard for public records constituting trade secrets. Such records are not categorically exempt from disclosure or removed from the purview of RCW 42.56.540 when an injunction is sought. We remand for the superior court to make the fact-based determination of whether L/R are entitled to injunctive relief under the PRA to prevent the City from disclosing the requested L/R zip code records.

_____

Stephens, J.

WE CONCUR:

_____

Johnson, J.

_____

Madsen, J.

_____

Owens, J.

_____

Gordon McCloud, J.

No. 94026-6

GONZÁLEZ, J. (concurring in part and dissenting in part)—Ultimately, this case is about competing interests: our legislature's recognition that trade secrets should not be unnecessarily disclosed versus the robust disclosure mechanism contemplated by the Public Records Act (PRA), ch. 42.56 RCW. The majority concludes that trade secret protection yields to PRA disclosure. I write separately because I am not convinced that this is the inevitable outcome based on our case law, nor that it is good policy.

Although the PRA generally requires disclosure of public records, *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978); *Amren v. City of Kalama*, 131 Wn.2d 25, 31, 929 P.2d 389 (1997), the mandate is not "absolute." *Resident Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 432, 327 P.3d 600 (2013). Among other things, trade secrets are protected:

> The legislature . . . recognizes that protection of trade secrets . . . promotes business activity and prevents unfair competition. Therefore, the legislature declares it a matter of public policy that the confidentiality of such information be protected and its unnecessary disclosure be prevented.

*Progressive Animal Welfare Soc., v. Univ. of Wash.*, 125 Wn.2d 243, 263, 884 P.2d

592 (1994) (*PAWS*) (plurality opinion) (first alteration in original) (emphasis

omitted) (quoting LAWS OF 1994, ch. 42, § 1). A trade secret does not lose its

confidential status when it is submitted to a public agency. *Boeing Co. v. Sierracin

Corp.*, 108 Wn.2d 38, 52, 738 P.2d 665 (1987).[1] And we have repeatedly

maintained that the PRA "may not be used to acquire knowledge of a trade secret."

*Confederated Tribes of Chehalis Reservation v. Johnson*, 135 Wn.2d 734, 748, 958

P.2d 260 (1998) (citing *PAWS*, 125 Wn.2d at 262 ("[T]he Public Records Act is

simply an improper means to acquire knowledge of a trade secret.")); *John Doe A

v. Wash. State Patrol*, 185 Wn.2d 363, 394, 374 P.3d 63 (2016).

The majority properly holds that the exemption comes from RCW

42.56.070, which states that a record is exempt "unless the record falls within the

specific exemptions of . . . [an] other statute which exempts or prohibits disclosure

of specific information or records."[2] This court has said the Uniform Trade Secrets

Act (UTSA), ch. 19.108 RCW, qualifies as an "other statute" and exempts certain

public record disclosure. *PAWS*, 125 Wn.2d at 262. Based on the "other statute"

---

[1] There is no dispute that the City of Seattle agreed to treat the zip code data as confidential. The city of Seattle signed a confidentiality agreement regarding the data and set up encrypted file transfer protocol sites so the data could be securely transmitted. Clerk's Papers at 2706-07, 2717; *see also* SEATTLE MUNICIPAL CODE 6.310.540(D).

[2] The parties in this case agree that no PRA provision exempts the zip code data in question.

language, Lyft[3] urges us to apply the UTSA's CR 65 injunction standard,[4] and

conversely, the city of Seattle contends the PRA's injunction provision, RCW

42.56.540,[5] applies.

This is the central question to be decided, whether the PRA or the UTSA

applies to enjoin the release of public records that are also trade secrets. The

majority asserts that "the PRA injunction standard must apply" because prior

precedent requires it. Majority at 17. While this court has acknowledged that an

agency's promise of confidentiality does not override the requirements of the

disclosure law, *Hearst Corp.*, 90 Wn.2d at 137, we have never concluded that the

PRA overcomes the UTSA's trade secret protection, or that trade secret disclosure

can be properly enjoined under RCW 42.56.540. Indeed, as noted above, we have

explicitly held otherwise. *See, e.g., Confederated Tribes of Chehalis Reservation*,

135 Wn.2d at 748 (PRA "may not be used to acquire knowledge of a trade secret").

---

[3] I refer to Respondents Lyft, Uber, and Rasier collectively as "Lyft."

[4] CR 65 requires one seeking relief by temporary or permanent injunction show that (1) they have a "clear legal or equitable right," (2) they have a "well-grounded fear of immediate invasion of that right," and (3) the acts complained of are either resulting in or will result in actual and substantial injury" to that individual. *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982) (internal quotation marks omitted) (quoting *Port of Seattle v. Int'l Longshoremen's & Warehousemen's Union*, 52 Wn.2d 317, 319, 324 P.2d 1099 (1958)).

[5] RCW 42.56.540 provides in relevant part:

> The examination of any specific public record may be enjoined if . . . the superior court for the county in which the movant resides or in which the record is maintained, finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions.

3

By concluding RCW 42.56.540 applies, the majority assumes the answer to the

very question before the court.

Moreover, the cases the majority relies on do not require application of

RCW 42.56.540. In *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30,

36, 769 P.2d 283 (1989), we explained that for an action

> brought pursuant to the injunction statute (RCW 42.17.330) [, *recodified as*
> RCW 42.56.540], the initial determination will ordinarily be whether the
> information involved is in fact within one of the act's exemptions or within
> some other statute which exempts or prohibits disclosure of specific
> information or records. . . . If it is exempted or prohibited, then the judicial
> inquiry commences.

The majority relies in part on this case to state that when a record is "exempt under

the 'other statute,' then the 'judicial inquiry commences' with the court applying

the PRA injunction standard." Majority at 11 (quoting *Spokane Police Guild*, 112

Wn.2d at 36). It is certainly possible to read this sentence as endorsing the use of

RCW 42.56.540. But such a reading is not inevitable. Unlike the instant case,

*Spokane Police Guild* did not consider trade secrets, and the quoted language

explains only that a judicial inquiry "commences" once a public record is found to

be exempt; we did not opine on what this subsequent inquiry entails or, more

importantly, which injunction standard applies. 112 Wn.2d at 36.

*Soter v. Cowles Publishing Co.* also does not require RCW 42.56.540's

application. 162 Wn.2d 716, 757, 174 P.3d 60 (2007) (plurality opinion). The

*Soter* decision discusses the means of enjoining public records, noting that to

impose "the injunction [standard] *contemplated by RCW 42.56.540*, the trial court must find that a specific exemption applies and that disclosure would not be in the public interest." *Id.* (emphasis added and omitted). Like *Spokane Police Guild*, *Soter* did not concern trade secrets. And, by its language, the case concerns only injunctions contemplated under the PRA. *Soter* does not sustainably guide our determination of whether the PRA or the UTSA applies to public records that are also trade secrets. Contrary to the majority's assertion, it is not a fait accompli that the PRA governs the injunction at issue here.

The procedural pathway through which we review the injunction is instructive on this point. The PRA itself does not provide an exemption to the zip code data, but it provides for additional exemptions through the "other statute" language of the PRA, RCW 42.56.070. In this case, the UTSA is an "other statute" and exempts disclosure of the data as a trade secret. *See PAWS*, 125 Wn.2d at 262. The exemption itself, therefore, is not contained within the four corners of the PRA. When viewed through this procedural lens, *Soter* provides little guidance— let alone binding precedent—because the injunction contemplated here exists not within the PRA but outside it, in the UTSA.

The majority dismisses the express and robustly protective trade secret language in *PAWS* as inapposite because, ironically, like *Spokane Police Guild* and *Soter*, that case did not consider disclosure of trade secrets nor was an injunction at

5

issue. Majority at 19-20; *see also Belo Mgmt. Servs., Inc. v. Click! Network*, 184

Wn. App. 649, 656, 343 P.2d 370 (2014) (holding records were not trade secrets).

The majority cites *PAWS* and the *Deskbook* to clarify that "'[t]he only way to

[protect a trade secret] is to seek injunction relief pursuant to RCW 42.56.540,

which "governs access to the injunctive remedy.""" Majority at 23-24 (quoting

WASH. STATE BAR ASS'N, PUBLIC RECORDS ACT DESKBOOK: WASHINGTON'S

PUBLIC DISCLOSURE AND OPEN PUBLIC MEETINGS LAW § 13.5, at 13-18 (2d ed.

2014) (DESKBOOK) (quoting *PAWS*, 125 Wn.2d at 257-58)). On first blush, this

explanation gives us pause. If we have held, as the *Deskbook* quotes and the

majority suggests, that RCW 42.56.540 "'governs access to the injunctive

remedy,'" *id.* (internal quotation marks omitted) (quoting DESKBOOK § 13.5, at 13-

18), logically that standard must apply whenever a party seeks to enjoin disclosure,

regardless of how the exemption occurs.

However, *PAWS* is not so definitive. In fact, the *Deskbook* misquotes

*PAWS*. This case actually states that RCW 45.56.540 "is simply an injunction

statute. It is a *procedural* provision which allows a superior court to enjoin the

release of *specific* public records if they fall within *specific* exemptions found

elsewhere in the [PRA]. Stated another way, [RCW 45.56.540] *governs access to a*

*remedy.*" 125 Wn.2d at 257-58 (some emphasis and boldface added). If this court

had already decided RCW 42.56.540 governs access to every public record

injunction, we would have said the provision is "the" remedy, not "a" remedy.

*Accord Spokane Police Guild*, 112 Wn.2d at 36 (noting that if a record is exempt under the PRA or an "other statute," then the court can consider *an* injunctive remedy). Thus, aside from the majority's desire to apply RCW 42.56.540, nothing in *PAWS*, *Soter*, *Spokane Police Guild*, or the PRA itself requires its application for the purposes of enjoining trade secret disclosure.

Instead, we should apply the UTSA's injunction standard set out in CR 65. Under this rule, a party must show (1) a clear legal or equitable right, (2) a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of will result in actual or substantial injury. *Tyler Pipe Indus., Inc. v. Dep't of Revenue*, 96 Wn.2d 785, 792, 638 P.2d 1213 (1982).

The UTSA authorizes an injunction as a remedy when there has been an actual or threatened misappropriation of trade secrets. RCW 19.108.020(1). "'Misappropriation' means: . . . (b) Disclosure or use of a trade secret of another without express or implied consent by a person who . . . (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." RCW 19.108.010(2).

*PAWS* underscores that threatened misappropriation qualifies for injunction under the UTSA: "Actual or even threatened misappropriation may be enjoined.

Given the *potential*" for certain records to qualify as trade secrets, the "other

statute" provision of the PRA "operates as an independent limit on disclosure of

portions of the records at issue here that have even potential economic value." 125

Wn.2d at 262. The majority implies misappropriation is absent here, but Lyft

satisfies the "threatened misappropriation" standard discussed in *PAWS*. RCW

19.108.020(1) ("Actual or threatened misappropriation may be enjoined."). The

zip code data constitutes trade secrets that, as the trial court found, have far more

than the potential for economic value, they derive economic value from not being

generally known to the competitors. *See also* Clerk's Papers (CP) at 3767-68.

Upon disclosure by the city of Seattle, the data would be used by Lyft and by its

competitors. Report of Proceedings (Oct. 11, 2016) at 97; Report of Proceedings

(Oct. 10, 2016) at 106 (Uber would pay for its competitors' zip code data because

it "ha[s] a ton of value."); *see generally* Resp't Lyft, Inc.'s Answering Br. at 22-27

(noting extensive testimony in the record explaining how companies would utilize

zip code data).

The trial court properly found that Lyft met the CR 65 injunction standard.

As discussed above, the company established the first element of CR 65: that the

zip code data constitutes a trade secret that is legally protected by the UTSA. The

city of Seattle has not challenged the second element, that is, the finding of an

immediate invasion of that right. And Lyft has also demonstrated a well-grounded

fear that its right to protect trade secrets will be invaded. *See id.* at 34-37 (record citations detailing the competitive harm companies would suffer from zip code disclosure). Thus, "allowing . . . any member of the public to examine the Zip Code Data . . . would *clearly not be in the public interest* and would *substantially and irreparably damage* Lyft and Rasier." CP at 2720 (emphasis added).

CR 65 is the better vehicle to examine whether trade secrets should be enjoined because it balances the interests of protecting a company's trade secrets with the injury their disclosure could cause. By requiring application of the PRA injunction provision and thereby elevating the PRA over trade secrets in this context, the majority has made it harder for businesses to protect their intellectual property.[6]

Despite the PRA's broad disclosure mandate, it is not absolute. The PRA contains numerous exemptions that protect certain information, and these exemptions are provided solely to protect relevant privacy rights that sometimes outweigh disclosure. *Resident Action Council*, 177 Wn.2d at 432 (citing *Limstrom v. Ladenburg*, 136 Wn.2d 595, 607, 963 P.2d 869 (1998)). Washington's legislature has expressed its intent to protect trade secrets from unnecessary disclosure. LAWS OF 1994, ch. 42, § 1. In this case, disclosure of the zip code

---

[6] The majority's rule will also encourage forum shopping. By requiring parties to satisfy a higher burden to enjoin trade secret disclosure, parties will likely bring an injunction under federal law. *See* 18 U.S.C. § 1836 (injunction standard for trade secrets in federal court).

trade secrets was not only unnecessary, Lyft sufficiently demonstrated that disclosure would immediately and irreparably harm its interests. While the PRA is a strongly worded mandate for disclosure, exemptions exist that this court must respect and effectuate. The case at hand is one in which we must balance this mandate for disclosure with the legislature's express wish to protect trade secrets. Because we have yet to determine the proper injunction provision applicable to trade secrets that are also public records, I would balance these competing interests by applying CR 65.

With these considerations in mind, I respectfully concur in part and dissent in part.

González, J.

Fairhurst, C.J.

Wiggins, J.

Gordon McCloud, J.

No. 94026-6

GORDON McCLOUD, J. (concurring in concurrence/dissent)—Trade secrets

are private property. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04, 104 S.

Ct. 2862, 81 L. Ed. 2d 815 (1984). The constitutions of both this state and the United

States protect such private property from a government "taking" without just

compensation. *Id.*; U.S. CONST. amend. V; WASH. CONST. art. I, § 16.

It can certainly be difficult to determine whether government acquisition of

such protected private property for a legitimate government use constitutes a simple

regulatory law or a taking that triggers constitutional protections and just

compensation. *Monsanto*, 467 U.S. at 1005; *Horne v. Dep't of Agric.*, 576 U.S. ___,

135 S. Ct. 2419, 2429, 192 L. Ed. 2d 388 (2015). The parties do not mention this

issue at all in the instant case; maybe they believe that the facts of this case provide

no reason to be concerned about that constitutional protection. But the majority has

written a decision interpreting the Public Records Act (PRA), chapter 42.56 RCW,

to ignore that constitutional protection, even in cases where it clearly applies—that

1

is, cases where the owner of privately held trade secrets discloses them to the government, at the government's request, for a government purpose, with a legitimate expectation of privacy that the information will not be disclosed to private parties.

Under United States Supreme Court precedent, such information enjoys constitutional protection against a "taking" without just compensation under the constitution. *Monsanto*, 467 U.S. at 1013-14. Under the majority's reasoning, I'm not so sure.

The reason I'm not sure is that the majority interprets the PRA to permit such a taking without any remedy to stop it and with no discussion of just compensation to redress it. That interpretation would allow one corporation to gain trade secret intellectual property submitted to state government for a legitimate regulatory purpose by a competitor corporation just by asking.

But we interpret legislative enactments to avoid absurd results. *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002) ("This court . . . will avoid literal reading of a statute which would result in unlikely, absurd, or strained consequences.") I cannot believe that the legislature drafted the PRA to accomplish such a constitutionally suspect result.

I therefore agree completely with the concurrence/dissent. I agree with its statutory analysis. I also believe that that is the only interpretation of the PRA that the legislature could have intended.